J-E03001-15

2016 PA Super 24

| | |
|---|---|
| AMY HUSS, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| JAMES P. WEAVER, | |
| Appellee | No. 1703 WDA 2013 |

Appeal from the Order Entered September 25, 2013
In the Court of Common Pleas of Washington County
Civil Division at No(s): 2013-1209

BEFORE:  GANTMAN, P.J., BENDER, P.J.E., BOWES, J., PANELLA, J.,
SHOGAN, J., LAZARUS, J., OTT, J., STABILE, J., and JENKINS, J.

OPINION BY BENDER, P.J.E.:                   **FILED FEBRUARY 05, 2016**

Amy Huss ("Huss") appeals from the September 25, 2013 order sustaining preliminary objections filed by James P. Weaver ("Weaver") in response to Huss' contract action against Weaver. For the reasons that follow, we reverse.

In October 2008, Huss and Weaver, who were involved in a romantic relationship, entered into a contract ("Agreement") in which they agreed that if their relationship resulted in the birth of a child, Huss would have primary physical custody and Weaver would have specified visitation rights, and that if Weaver sought court modification of these terms he would pay Huss $10,000 for each such attempt. The parties had a son in November 2010 and Weaver filed a complaint for custody in December 2010. Huss

then filed a complaint alleging that Weaver had failed to abide by his contractual promise to make the required $10,000 payments.

Specifically, Huss filed her initial complaint on March 7, 2013, alleging a single count for breach of contract. In response to the preliminary objections filed by Weaver, on April 19, 2013, Huss filed an amended complaint, adding causes of action for negligent misrepresentation and fraud. On May 7, 2013, Weaver filed preliminary objections in the nature of demurrers to the amended complaint, asserting that the $10,000 modification provision of the Agreement violated public policy and that the negligent misrepresentation and fraud causes of action were barred by the economic loss doctrine. On September 25, 2013, the trial court entered the order now on appeal and an accompanying opinion, sustaining Weaver's preliminary objections and dismissing Huss' amended complaint with prejudice.

In her amended complaint, Huss alleged that the parties entered into the Agreement on October 17, 2008, that at that time Weaver was a practicing attorney with the law firm of Buchanan Ingersoll & Rooney in Pittsburgh, and that he had provided Huss with "legal representation in various legal matters." Amended Complaint, 4/19/13, at ¶¶ 3-6. Huss further alleged that Weaver, along with a colleague at the Buchanan Ingersoll & Rooney law firm, drafted the Agreement. *Id.* at ¶ 5. The relevant provisions of the Agreement state as follows:

WHEREAS, currently [Huss] is a real estate agent capable of earning large commissions if she works excessive hours and [Weaver] is an attorney capable of earning a large salary; and

WHEREAS, in the event that [Huss] has a child or children of [Weaver] and the parties' relationship is ended by either party, whether or not the parties are married at the time of the termination of the relationship, the parties desire to set forth their agreement as to the custody of such child or children.

NOW THEREFORE the parties for and in consideration of the covenants contained in the Agreement, and intending to be legally bound thereby, agree as follows:

1.    Custody.   In the event that either [Weaver] or [Huss] terminates the relationship with the other, whether or not they are married at the time of such termination, the legal custody of any child by this Agreement shall be shared by [Weaver] and [Huss] shall have primary physical custody of such children.  In the event such termination of the relationship occurs, [Weaver] agrees that he will not pursue full physical custody of any child by this agreement and further agrees that he will not attempt to use the fact that [Huss] must work excessive hours selling real estate in order to earn large commissions to pursue custody of such child or children.

2.    Visitation.   In the event that either [Weaver] or [Huss] terminates the relationship with the other, whether they are married at the time of such termination, [Weaver] shall be entitled to unsupervised visitation with any child by this Agreement as follows:

   a.   So long as the parties reside within 50 miles of one another, [Weaver] shall be entitled to every other weekend beginning a 7 p.m. Friday evening and ending 4 p.m. Sunday evening.  [Weaver] agrees to be responsible for transportation.

   b.   In the event that the parties reside more than 50 miles from one another, [Weaver] shall be entitled to one month during the summer as agreed to by the parties.

   c.   [Huss] has the right to relocate out of state if she desires.

3.Support. [Weaver] agrees that, regardless of any custody arrangement between the parties, [Weaver] waives any rights to pursue [Huss] for child support for any child. [Weaver] further agrees to pay [Huss] child support for any child or children to be agreed upon by the parties or determined by Domestic Relations.

4. Modification of Agreement. This Agreement may only be modified or amended by the parties by a written instrument signed by both [Weaver] and [Huss]. The parties acknowledge that this Agreement may be modified or superseded by a court of competent jurisdiction. **In the event that [Weaver] files a complaint, motion, petition or similar pleading seeking the modification or amendment of the custody and/or visitation provisions set forth herein, [Weaver] agrees to pay [Huss] $10,000 for each modification or amendment sought.**

5. Voluntary Agreement. Each party understands that in the absence of this Agreement, as a matter of law, that he or she might be entitled to a greater level of custody or more visitation than is provided herein. Both parties acknowledge that they have read this Agreement carefully and thoroughly, and each considers the provisions of this Agreement to be fair, just and reasonable, and that they fully understand each of its provisions and are executing the same freely and voluntarily, without coercion or other compulsion.

*Id.* at ¶ 3 (Exhibit A) (emphasis added).

Huss also alleged in her amended complaint that Weaver had breached the highlighted portion of paragraph 4 of the Agreement. She noted that, since the birth of their son, the parties have been "embroiled in litigation" regarding custody and visitation issues, that Weaver filed numerous "complaints, motions, petitions, and/or similar pleadings," and that he failed and refused to pay her $10,000 for each such filing. *Id.* at ¶¶ 9-12. Finally, Huss contended that Weaver, as her legal advisor, either negligently or

intentionally misrepresented to her that she should enter into the Agreement, which "she in fact did not wish to enter," and that he never indicated to her that he believed any of its provisions to be against public policy. *Id.* at ¶¶ 14-19, 28-32.

The trial court dismissed Huss' complaint, ruling that the provision for the $10,000 payments was void as against public policy. In its written opinion in support of its sustaining of Weaver's preliminary objections, the trial court first cited cases holding that parents may not bargain away their child's right to receive child support. Trial Court Opinion, 9/25/13, at 2 (citing *Knorr v. Knorr*, 588 A.2d 503, 505 (Pa. 1991)). The trial court then noted that custody agreements between parents are subject to court modification in the best interests of the child. *Id.* (citing *Mumma v. Mumma*, 550 A.2d 1341, 1343 (Pa. Super. 1988)). Based on these tenets, the trial court reasoned as follows:

> Imposing a fee upon [Weaver] to pay $10,000 if he decides to file a modification of child custody is against the public policy of assuring continuing contact between child and parent. It substantially impairs the Court's power and the Commonwealth's duty to determine what is in a child's best interest. "Our paramount concern in child custody matters is the best interests of the children." *Yates v. Yates*, 963 A.2d 535, 539 (Pa. Super. 2008). It is against public policy to impose a fee on one party in order to determine the best interests of the child.

*Id.* at 2-3.[1]

Huss filed a notice of appeal and the case was assigned to a three-judge panel of this Court. Following the panel's review, it determined that the trial court's ruling with respect to the $10,000 clause was in error, *i.e.*, the Agreement was not unenforceable as against public policy. Thus, the trial court's sustaining of Weaver's preliminary objections was overturned. *See Huss v. Weaver*, 2014 PA Super 238 (Pa. Super. filed October 21, 2014). Weaver then filed a timely application for reargument before the court *en banc*, which was granted by *per curiam* order, dated December 12, 2014. Thus, the panel decision was withdrawn on December 12, 2014.

Following the submission of briefs for the *en banc* argument, Huss filed an application to strike Weaver's substituted brief, averring that it violated various rules of appellate procedure, because it included a recitation of numerous facts that were not a part of the record on appeal. The application to strike was deferred to this *en banc* merits panel for resolution. *See* Superior Court Orders, 2/4/15, 8/24/15. Although we recognize, and

---

[1] The trial court also indicated that the provision in paragraph 3 of the Agreement preventing Weaver from filing for child support from Huss if he is ever awarded custody violates public policy. *Id.* at 2. In her present action, however, Huss is not attempting to enforce this provision and thus its enforceability is not at issue here. Moreover, its enforceability should have no effect on the issues currently ripe for resolution, since the Agreement contains a severability clause providing that if any of its provisions are determined to conflict with Pennsylvania law, "the remaining terms of this Agreement shall remain in full force and effect." Amended Complaint, 4/19/13, at ¶ 3 (Exhibit A, ¶ 7).

Weaver acknowledges, that some of the facts he references in his brief are not of record, we will not strike his brief. Rather, because our standard of review limits what we may consider in reaching our decision here, we are able to address Huss' issues without consideration of any facts not contained in the complaint and the attached Agreement. ***See Martin v. Rite Aid of Pennsylvania***, 80 A.3d 813 (Pa. Super. 2013).

Huss raises the following issues for our review:

1. Did the lower court err in concluding that the parties' Agreement was not enforceable as a matter of public policy?

2. Whether [Weaver, an attorney] who drafted a contract should be estopped from asserting the contract is unenforceable when he advised [Huss] the contract was legal and enforceable?

Huss' Brief at 3.

Before addressing Huss' issues, we note that we are guided by the following:

In reviewing a trial court's grant of preliminary objections, the standard of review is *de novo* and the scope of review is plenary. The salient facts are derived solely from the complaint and pursuant to that standard of review, the court accepts all well-pleaded material facts in the complaint, and all inferences reasonably deduced therefrom must be accepted as true.

***Martin***, 80 A.3d at 814 (quoting ***Keller v. Scranton City Treasurer***, 29 A.3d 436, 443 n.12 (Pa. Cmwlth. 2011) (internal citations omitted)).

Huss' first issue on appeal requires us to determine whether the above highlighted "$10,000 clause" is unenforceable as against public policy. In ***Ferguson v. McKiernan***, 940 A.2d 1236 (Pa. 2007), our Supreme Court

instructed us on the proper legal standards to apply when deciding such issues:

> In assessing whether a contractual agreement violates public policy
>
> > this Court is mindful that public policy is more than a vague goal which may be used to circumvent the plain meaning of the contract. ***Hall v. Amica Mut. Ins. Co.***, 538 Pa. 337, 347, 648 A.2d 755, 760 (1994) [....]
> >
> > > Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest. As the term 'public policy' is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy.... Only dominant public policy would justify such action. In the absence of a plain indication of that policy through long governmental practice or statutory enactments, or of violations of obvious ethical or moral standards, the Court should not assume to declare contracts ... contrary to public policy. The courts must be content to await legislative action.
> >
> > ***Id.*** at 347–48, 648 A.2d at 760 (citations omitted). This Court has further elaborated that:
> >
> > > It is only when a given policy is so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of the community in so declaring [that the contract is against public policy].
> >
> > ***Mamlin v. Genoe***, 340 Pa. 320, 325, 17 A.2d 407, 409 (1941).

***Ferguson***, 940 A.2d at 1245 n.16 (quoting ***Eichelman v. N'wide Ins. Co.***, 711 A.2d 1006, 1008 (Pa. 1998)).

Contrary to the decision reached by the trial court, we have not identified any "dominant public policy" grounded in governmental practice, statutory enactments, or violations of obvious ethical or moral standards, which provides a basis for declaring the "$10,000 clause" in the Agreement to be unenforceable as against public policy. The trial court grounded its analysis on *Knorr*, in which our Supreme Court held that parents have no power to "bargain away the rights of their children," and that if an agreement between parents for child support provides "less than required or less than can be given," courts may ignore the agreement and require a satisfactory level of support. *Knorr*, 588 A.2d at 505. Subsequent to *Knorr*, this Court has routinely held that a child's right to adequate support payments cannot be bargained away and that any release or compromise on child support obligations is invalid if it prejudices the child's welfare. *See, e.g.*, *Sams v. Sams*, 808 A.2d 206, 211 (Pa. Super. 2002); *Ruth F. v. Robert B.*, 690 A.2d 1171, 1172 (Pa. Super. 1997); *Hyde v. Hyde*, 618 A.2d 406, 408 (Pa. Super. 1992).

However, no similar appellate authority exists with respect to agreements between parents regarding custody and visitation. While custody and visitation agreements are always subject to modification by the courts in the best interests of the child, *Mumma*, 550 A.2d at 1343, we are unaware of any cases in which Pennsylvania courts have declared such contracts to be unenforceable as against public policy. The reason for this

distinction would appear to be obvious, since the right to child support **belongs to the child**, and thus cannot be "bargained away" by the parents. **See Kesler v. Weniger**, 744 A.2d 794, 796 (Pa. Super. 2000) ("[T]he right to support is a right of the child, not the mother or father…."). Accordingly, when the parents agree among themselves to provide an inadequate level of child support, the child's rights have been violated and thus the agreement may be declared void as against public policy. **See, e.g**., **Sams**, 808 A.2d at 213 ("[T]he agreement [is] invalid on public policy grounds, because Mother had no power to bargain away her children's right to support by reducing Father's obligation from $3,400/month support to $1,000/month.").

Rights to custody and visitation, on the other hand, belong to the parents (or guardians). 23 Pa.C.S. § 5322; Pa.R.C.P. 1915.1(b). Because children are not mere chattel, agreements regarding custody and visitation are always subject to court review and adjustment in the best interests of the child. **Mumma**, 550 A.2d at 1343; **Com. ex rel. Veihdeffer v. Veihdeffer**, 344 A.2d 613, 614 (Pa. Super. 1975) ("A child cannot be made the subject of a contract with the same force and effect as if it were a mere chattel…."). In no way, however, do custody and visitation agreements involve the bargaining away of the rights of the children, and accordingly they are not unenforceable as against public policy on the same basis as are agreements regarding child support. **See generally Lee v. Child Care**

*Service Delaware County*, 337 A.2d 586, 590 (Pa. 1975) ("Pennsylvania precedents merely provide that contracts for custody of children will not foreclose a court from making a contrary disposition in the best interests of the child. This doctrine does not support appellants' claim that 'placement agreements' are void as against public policy.").

The trial court nevertheless concluded that the "$10,000 clause" is unenforceable as against public policy because it "substantially impairs the Court's power and the Commonwealth's duty to determine what is in a child's best interests." Trial Court Opinion, 9/25/13, at 2-3. To this end, in its written opinion, the trial court refers to the "10,000 clause" as a "fee," an "impediment," an "impairment," and would have a "chilling effect" on the filing of custody complaints or modification petitions. *Id.* at 2-5. In support of this position, in his appellate brief Weaver cites this Court's decision in *Kraisinger v. Kraisinger*, 928 A.2d 333 (Pa. Super. 2007), a case in which we struck down as invalid a provision in a child support agreement requiring the mother to pay the father's legal fees if she challenged the amount of child support set forth in their agreement. *Id.* at 345. The parties' agreement specifically provided that the attorneys' fees provision was included to "discourage frivolous filings." *Id.* at 337. In accord with the rationale employed in the above-discussed child support cases, we concluded that "[w]e cannot tolerate a provision which penalizes a parent for pursuing her children's rights." *Id.* at 345.

The issue of whether a provision in a custody/visitation contract that places a serious impediment on either party's ability to seek court modification in the best interests of the child is not presently before this Court. No language in the Agreement at issue here provides either that the "$10,000 clause" is intended to discourage Weaver from seeking court intervention, or evidences that the payment would act as an impediment to his ability to do so. Whether the "$10,000 clause" would act as an impediment would depend, first and foremost, upon Weaver's financial ability to pay it. In the Agreement, however, Weaver plainly acknowledged that he "is an attorney capable of earning a large salary." Amended Complaint, 4/19/13, (Exhibit A). He also straightforwardly recognized that all of the terms of the Agreement (including the "$10,000 clause" in the immediately preceding paragraph) are "fair, just and reasonable." *Id.* at ¶ 5. Finally, Weaver agreed that he fully understood each of the Agreement's provisions and executed it "freely and voluntarily, without coercion or other compulsion." *Id.*

As set forth above, our standard of review in this circumstance provides that the salient facts must be derived solely from Huss' amended complaint (including the attached Agreement), and that we must treat all well-pleaded material facts in the amended complaint, and all inferences reasonably deduced therefrom, as true. *Martin*, 80 A.3d at 814. No facts of record support a finding that the "$10,000 clause" constituted an

impediment to Weaver's ability to seek court modification of any of the terms of the Agreement.

Huss contends that the "$10,000 clause" was intended as a "defense fund" in the event of litigation regarding the Agreement. Huss' Brief at 12. While we agree with the trial court that the Agreement contains no specific language to support this suggestion, we cannot also agree that the parol evidence rule would bar her from testifying about her understanding of the parties' intentions with respect to this payment. *See, e.g.*, *Steuart v. McChesney*, 444 A.2d 659, 663 (Pa. 1982) (explaining that parol evidence is admissible to explain, clarify, and resolve ambiguities). Whether the parties intended to provide Huss with a "defense fund" to assist with the cost of any future litigation may depend upon the parties' relative abilities to afford the expense of any such future litigation. In this regard, the first "WHEREAS" clause in the Agreement is ambiguous, as it leaves their relative financial capabilities unclear. Weaver is described as an attorney "capable of earning a large salary," while Huss is a real estate agent "capable of earning large commissions *if she works excessive hours*." Amended Complaint, 4/19/13, (Exhibit A) (emphasis added). Without parol evidence, we cannot ascertain whether this provision intended to convey that the parties have approximately the same capabilities to earn large salaries/commissions, or alternatively if Weaver is best able to earn more money (since he apparently can do so without working excessive hours, which arguably would be difficult

for Huss to do after the birth of their child).[2]  In short, whether the parties recognized Weaver's superior ability to finance the cost of future litigation, and thus provided for a "defense fund" in the Agreement, is not clear.

For these reasons, we conclude that the trial court erred in ruling that the "$10,000 clause" in the Agreement is unenforceable as against public policy.  The record does not reflect that this provision constitutes any limitation on Weaver's ability to seek court intervention to modify the custody and/or visitation provisions in the Agreement between these parties in the best interests of the child.

The trial court dismissed Huss' claims for negligent misrepresentation and fraud because she "cannot point to any real damages."  Trial Court Opinion, 9/25/13, at 5.  However, based upon our ruling here that the "$10,000 clause" is not unenforceable as against public policy, damages for Weaver's breach of this provision may be available to Huss.  As a result, dismissal of these causes of action on demurrers was also error.[3]

Order reversed.  Case remanded.  Jurisdiction relinquished.

---

[2] In her amended complaint, Huss alleges that Weaver drafted the Agreement.  Amended Complaint, 4/19/13, at ¶ 5.  Ordinary principles of contract interpretation provide that ambiguities are to be construed against the drafter, ***Insurance Adjustment Bureau, Inc. v. Allstate Ins. Co.***, 905 A.2d 462, 468 (Pa. 2006), further strengthening Huss' contention that the "$10,000 clause" was intended as a defense fund.

[3] In light of our disposition of Huss' first issue on appeal, it is not necessary to address her second issue.

President Judge Gantman and Judges Panella, Lazarus, Ott and Stabile join this opinion.

Judge Bowes files a concurring opinion in which Judges Shogan, Lazarus and Stabile join.

Judge Shogan concurs in the result of the majority opinion

Judge Jenkins files a dissenting opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/5/2016